UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
FRANCIA M. VARGAS,

                         Plaintiff,                          10 Civ. 6306 (PKC)

          -v-                                                MEMORANDUM
                                                             AND
                                                             ORDER

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

                         Defendant.
-----------------------------------------------------------x

P. KEVIN CASTEL, District Judge:

                    Plaintiff Francia M. Vargas, proceeding pro se, seeks judicial review of a

final decision by the Commissioner of Social Security (the "Commissioner") denying her

application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. § 1381 et seq.  Plaintiff asserts that the decision of the

Administrative Law Judge ("ALJ") was "erroneous, not supported by substantial

evidence on the record, and/or contrary to the law."  (Compl. ¶ 9)  Defendant has moved

for judgment on the pleadings pursuant to Rule 12(c), Fed. R. Civ. P.  For the reasons

explained below, the defendant's motion is granted.


I.        PROCEDURAL HISTORY

                    On January 10, 2008, plaintiff applied to the Social Security

Administration ("SSA") for SSI benefits. (R. 97)[1]  On May 13, 2008, the SSA determined

that plaintiff's alleged mental disorder and hearing loss were not severe enough to

prevent her from working and denied her application.  (R. 50, 53-56)  The SSA notified

_____

[1] Citations to "(R. __)" refer to the certified copy of the administrative record of proceedings filed by the
Commissioner as part of his answer.  (Docket No. 9)

plaintiff that her claim was disapproved and informed her of her right to request a hearing.  (R. 54-55)

Plaintiff then requested a de novo hearing before an Administrative Law Judge ("ALJ"), which was held on October 1, 2009.  (R. 63-68)  Plaintiff appeared with a representative before ALJ Margaret L. Pecoraro.  (R. 29-49)

On October 23, 2009, ALJ Pecoraro denied plaintiff's claim for benefits. (R. 13-28)  After applying the five-step sequential test for determining whether an individual is disabled, ALJ Pecoraro concluded that plaintiff is not disabled under section 1614(a)(3)(A) of the Social Security Act.  (R. 19)  She reviewed plaintiff's claims stemming from her mental disorder, hearing loss, as well as pain in her knees, and determined that plaintiff has a severe combination of impairments -- depressive disorder and panic disorder without agoraphobia, left ear hearing loss, and mild degenerative joint disease of the knees -- but still has the residual functional capacity ("RFC") to perform the full range of light work defined in 20 CFR 416.967(b).  (R. 23)

On October 29, 2009, plaintiff requested review of the ALJ's decision. (R. 8-11)  The SSA Appeals Council denied plaintiff's request, and ALJ Pecoraro's decision became the final decision of the Commissioner on July 16, 2010.  (R. 1)  This case was then ripe for judicial review.

On August 3, 2010, plaintiff, proceeding pro se, filed a timely action with this Court seeking review of the Commissioner's final decision.[2]  (Compl. ¶ 1)  A notice of appearance was filed on behalf of defendant on September 10, 2010.  (Docket #4)

---

[2] The Act requires a plaintiff to commence a civil action within sixty days from the date the notice of the Appeals Council's decision is received.  42 U.S.C. § 1383(c); 20 C.F.R. § 416.1481.

Defendant moved for a judgment on the pleadings, pursuant to Rule 12(c),

Fed. R. Civ. P., on February 7, 2011.  (Docket #10).

## II.     EVIDENCE BEFORE THE ALJ

At the hearing before ALJ Pecoraro, plaintiff testified about her age,

education, background, family, work history, daily activities, and physical and

psychiatric condition.  (R. 33-48)  ALJ Pecoraro also reviewed documentary evidence

including: plaintiff's medical records from Morris Heights Health Center ("MHHC"); a

report from Dr. Arlene Broska, a psychologist who performed a consultative psychiatric

evaluation on the plaintiff; the opinion of a State agency review psychologist; a report

from Dr. James Naughton, an internal medicine specialist who performed a consultative

physical examination on the plaintiff; and a report from Dr. Abraham Eviatar, an ear,

nose and throat specialist who performed a consultative physical examination on the

plaintiff.

### A.  Non-Medical Evidence

Plaintiff was born in the Dominican Republic on November 19, 1969, and

immigrated to the United States on October 10, 1994. (R. 33, 97)  She was thirty-eight

and thirty-nine years old during the period at issue.  (R. 107)  She lives on the first floor

of a walk-up apartment building with her two children, a daughter who is fifteen years

old and a son who is ten years old.  (R. 44, 98)  Both children have medical problems due

to premature births and receive SSI benefits.  (R. 34-35)  Plaintiff helps her son get ready

for school each morning, prepares his breakfast and takes him to school.  (R. 39)  Every

Friday, she walks her daughter to a therapy appointment five blocks away.  (Id.)  Plaintiff

does chores around the house which include: cleaning the apartment, making meals,

helping her son with his homework, doing the laundry, paying the bills with her children's SSI benefits, and grocery shopping when she receives food stamps. (R. 38-41) She has no friends and her only family is her father, who she has not seen in "a very long time." (R. 39-40) Two or three times a week, she goes to a church two blocks from her home for church services and bible study. (R. 40) Church members also visit her to pray and talk. (R. 40-41)

Plaintiff completed twelve years of education in the Dominican Republic but does not speak or write in English. (R. 33, 124) Plaintiff reported that she worked in the past as a waitress, but she has no record of earnings. (R. 34, 106, 120-21, 126-27) Plaintiff does not have a driver's license, and instead takes the bus and subway. (R. 47-48, 113)

Plaintiff testified that she missed scheduled appointments at the MHHC because she was too depressed to go out. (R. 36) Plaintiff initially indicated that she was taking Ambilify, Trazadone and Provigil for her depression and trouble sleeping. However, she later testified that she had run out of medicine after she stopped attending appointments at MHHC and acknowledged that she had not taken any medication for her depression since 2008. (R. 35-37) She testified that when she was getting regular treatment, she felt better. (R. 38)

Plaintiff testified that she had been receiving acupuncture therapy for her knee for the previous few months. (R. 42-43, 46-47) She testified that a doctor had prescribed a cane for her in 2006, and that she used it every day in her home and outside. (R.43) She testified that her right knee was painful and because she favored it, her left knee was starting to bother her. (Id.) She stated that her knees hurt when she sat for long

periods of time, and worsened when she lay down.  (Id.)  She stated that she was able to climb the flight of stairs to her apartment with discomfort.  (R. 44)  She stated that she had been prescribed pain medication, but it made her sleepy.  (Id.)

    B.  <u>Medical Evidence</u>

        1.  <u>Evidence Prior to Filing of Application for Benefits</u>

Plaintiff's medical records included treatments for mental health issues, knee pain and hearing loss. Plaintiff was treated for mental health issues from 2001 to 2007 at Morris Heights Health Center.  (R. 150-62, 254-64, 291-95)  In February 2001, plaintiff visited MHHC complaining of depression after learning of fetal defects during her pregnancy.  (R. 275, 158-60)  After observing that her mood was moderately depressed and her affect anxious, a psychiatrist diagnosed dysthymia and recommended therapy.  (R.160)

In January 2002, plaintiff was screened by a certified social worker.  (R. 150-52)  On April 4, 2002, she was screened by another certified social worker.  (R. 153-57)  Intake records from this visit describe plaintiff as depressed, anxious and reporting auditory and visual hallucinations. (R. 153)  Specifically, she reported hearing voices and seeing shadows.  (R. 156)  The social worker reported that plaintiff's intelligence was average and that she was fully oriented to person, place and time.  (Id.)  She also noted that plaintiff's appearance, behavior, speech and thought processes were all normal. (R. 155-56)  The social worker diagnosed major depression with psychosis. (R. 157)

Plaintiff continued to receive treatment from MHHC through August 2007.  (R. 308)  Records from this time report that she continued to feel anxious and depressed.  (R. 256-57, 273-74)  In September 2006, plaintiff's primary care physician,

Dr. Robert Sheldon, completed a residual functional capacity assessment.  (R. 250-53)  In this assessment, Dr. Sheldon opined that her depression seldom interfered with her attention and concentration.  (R. 253)

In October 2006, a licensed clinical social worker at MHHC, Miguel Angel Medina, completed a mental impairment questionnaire.  (R. 291-95)  He noted that plaintiff's case had been opened in September 2003 and while she had initially received weekly treatments, she was presently receiving biweekly treatments.  (R. 291)  He reported that she responded positively to both her individual psychotherapy and medication.  (Id.)  He stated that plaintiff had four or more episodes of decompensation within a twelve-month period because she was not taking her medication as prescribed and that she was more functional when she was on the medication.  (R. 292)  Plaintiff reported no negative side-effects from the medication.  (R. 291)  Mr. Medina assessed plaintiff's functional limitations, opining that she had mild limitations in her activities of daily living, moderate difficulties in maintaining social functioning, and marked deficiencies in concentration, persistence and pace.  (R. 292)  He noted that plaintiff had "unlimited or very good" ability to understand, remember, and carry out very short and simple instructions and "limited but satisfactory" ability to remember work-like procedures, maintain regular attendance and be punctual.  (R. 293)  Plaintiff was unable to meet competitive standards for sustaining an ordinary routine without special supervision or completing a normal workday and workweek without interruptions from psychologically-based symptoms.  (Id.)  The social worker diagnosed the plaintiff with major depressive disorder with psychotic features.  (R. 291)

In November 2007, Plaintiff was terminated from mental health treatment at MHHC because she failed to keep scheduled appointments. (R. 255)

Plaintiff was treated for right knee pain from 2005 to 2007. (R. 218, 171, 205-09)  In December 2005, Dr. Geoffrey Phillips performed an arthroscopy, partial lateral meniscectomy, and lateral release of the plaintiff's right knee after a MRI revealed a lateral meniscus tear and a CT scan confirmed patellar tilting and maltracking. (R. 199-204, 215-18)

During a physical examination at MHHC in September 2006, plaintiff's primary care physician, Dr. Sheldon, observed that she had full range of motion in her knees with slight crepitance.  He diagnosed mild degenerative joint disease of the knees, with plaintiff's right knee being worse than her left. (R. 171)  As previously noted, Dr. Sheldon completed a residual functional capacity questionnaire in that same month. (R. 250-53)  The report notes that Dr. Sheldon had been plaintiff's primary care doctor since 1995 and that he saw her every six to eight months. (R. 250)  He opined that plaintiff could walk up to five blocks without rest, sit up to two hours without getting up and stand up to four hours without sitting or walking around. (R. 251)  In an eight-hour work day, plaintiff could be expected to sit for at least six hours and stand/walk for about two hours. (Id.)  She required no unscheduled periods of walking around, however, she had to be able to shift positions at-will, from sitting, standing or walking. (Id.)  Dr. Sheldon opined that plaintiff could twist, stoop, crouch, and climb occasionally, and lift less than ten pounds frequently and up to twenty pounds rarely. (Id.)  She did not have limitations as to grasping, turning, fine manipulation or reaching. (R. 252)  Once again, Dr. Sheldon

diagnosed mild degenerative joint disease of the knees as well as left ear hearing loss. (R. 250)

Plaintiff attended physical therapy at Bronx-Lebanon Hospital Center in June 2007, after being referred by Dr. Sheldon.  (R. 205-09)  Plaintiff complained of a gradual onset of pain in her left knee over the previous eight months.  (R. 206)  She had not been taking any medication for the pain.  (Id.)  She rated the pain as a "6" out of "10" in severity, and noted that it became worse when walking, climbing stairs, and squatting. (Id.)  The physical therapist observed tenderness in plaintiff's left patella tendon and a limited ability to squat.  (R. 207)  Plaintiff was discharged from therapy in August 2007, due to a lack of attendance.  (R. 205)

Plaintiff had a long history of left-sided hearing difficulty. In October 2002, plaintiff underwent an audiological evaluation which revealed borderline normal hearing in the right ear and severe mixed hearing loss in the left ear.  (R. 167)  The following month, a tympanomastiodectomy was performed to repair a perforated left eardrum.  (R. 165, 168)  As a result of plaintiff's failure to adhere to follow-up care, she developed an infection in her ear canal which resulted in partial failure of the graft.  (Id.) In January 2003, plaintiff underwent surgery again to repair the perforated eardrum.  (R. 164, 166, 168-70)  In 2006, plaintiff was referred for a left ear hearing aid.  (R. 179)

    2.   Evidence Subsequent to Filing of Application for Benefits

        a.   Treating Physician's Records

Records from MHHC report that plaintiff was terminated from mental health treatment in 2007 for failing to attend scheduled appointments.  (R. 255)  She was again terminated in May 2008, not only for failing to attend scheduled appointments but

also failing to take her medication.  (R. 254)  Plaintiff visited Dr. Sheldon on June 10,

2009, and complained of depression.  (R. 279)  Dr. Sheldon noted that she had a mental

health appointment on July 27, 2009.  (Id.)  A letter from MHHC noted that she

subsequently missed this appointment as well as two previous appointments on April 6

and May 18, 2009.  (R. 266)

   During a visit to Dr. Sheldon on February 6, 2009, plaintiff complained of

right knee pain.  (R. 283)  Dr. Sheldon observed that plaintiff walked with a normal gait

and noted no right knee deformity.  (Id.)  He recommended physical therapy.  (Id.)

   On September 15, 2009, a physical therapist from Total Medical P.C.,

stated in a letter that plaintiff had been attending regular physical therapy treatment two

to three times per week since February 12, 2009.  (R. 265)

   b. <u>Other Medical Sources</u>

   Arlene Broska, Ph.D., performed a consultative psychological

examination of plaintiff on March 25, 2008, as part of the SSA's determination of

plaintiff's disability.[3]  (R. 194-98)  Plaintiff described her education, as well as work,

medical and family history to Dr. Broska.  (R. 194)  She reported that she was able to

dress, bathe and groom herself, though Dr. Broska noted that she was poorly groomed.

(R. 194-95)  She also stated that she could do household chores such as cooking,

cleaning, shopping and doing laundry.  (R. 196)  She expressed that she could not

manage money nor take public transportation.  (Id.)  Plaintiff stated that she did not

socialize and spent her days watching television or taking care of her children.  (R. 197)

---

[3]"A consultative examination is a physical or mental examination or test purchased for [claimant] at
[SSA's] request and expense from a treating source or another medical source…." 20 CFR § 416.919.  The
SSA will purchase a consultative examination when the claimant's sources do not provide sufficient
information to make a decision or when the SSA is unable to seek clarification from one of the claimant's
sources.  20 CFR § 416.912.

Plaintiff's complaints included:  difficulty falling asleep, loss of appetite, crying spells, being depressed "on and off," panic attacks when frightened, hearing voices twice a week, seeing shadows two to three times per week, and obsessive compulsive tendencies (R. 194-95)  She told Dr. Broska that she was taking medication for anxiety, depression and sleeping problems, though she did not bring the medications to the appointment.  (R. 194)  She reported seeing a therapist weekly and a psychiatrist biweekly at MHHC.  (Id.)

In her mental status examination of the plaintiff,  Dr. Broska observed that the plaintiff was marginally cooperative and a very poor informant.  (R. 195)  Her manner of relating, social skills and overall appearance were poor.  (Id.)  While her speech was fluent, clear, and adequately expressive, she frequently required repetition of questions. (R. 196)  Dr. Broska estimated that plaintiff's cognitive functioning was between below average and borderline with a general fund of information which was somewhat limited. (Id.)  Her thinking was coherent, although often labored, and she was oriented to person and place but not time.  (Id.)  The doctor noted that plaintiff's sensorium was clear and judgment fair but her attention, concentration and memory skills were impaired.  (Id.) Dr. Broska opined that plaintiff could follow and understand simple instructions and perform simple tasks independently.  (R. 197)  She assessed that plaintiff's affect was depressed, her mood dysthymic, and her insight was poor.  (R. 196)  Dr. Broska opined that plaintiff could perform complex tasks independently and appeared capable of making some appropriate decisions but that she might have difficulty maintaining attention and concentration, learning new tasks and maintaining a regular schedule.  (R. 197) Additionally,  plaintiff might not always relate adequately with others or appropriately

deal with stress.  (Id.)  Dr. Broska diagnosed depressive disorder, not otherwise specified, obsessive compulsive disorder, and panic disorder without agoraphobia.  (Id.)

On May 9, 2008, State review psychologist Dr. T. Harding reviewed plaintiff's medical records and completed a Psychiatric Review Technique Form and mental residual functional capacity assessment.  (R. 226-43)  He assessed mild restrictions in plaintiff's daily activities, moderate difficulties maintaining social functioning, and moderate difficulties maintaining concentration, persistence or pace.  (R. 236)  He also noted that she had not experienced any episodes of deterioration of extended duration.  (Id.)  Regarding plaintiff's residual functional capacity, Dr. Harding found no marked limitations in any areas of function.  (R. 240-41)  He noted mild to moderate limitations in understanding and memory, and moderate limitations in sustained concentration and persistence, social interaction and adaptation.  (Id.)  Based on his review of the medical records, including records from MHHC and Dr. Broska, the doctor diagnosed depression, not otherwise specified, and mixed anxiety disorder.  (R. 229, 231)  He opined that plaintiff could sustain a normal workday and workweek and could maintain a consistent pace to do at least unskilled work.  (R. 242)

On May 2, 2008, Dr. James Naughten performed a consultative internal medicine examination of plaintiff.  (R. 221-24)  The doctor observed that plaintiff walked with a stiff gait.  (R. 222)  She was imbalanced when walking on her heels and toes and had a limited ability to squat.  (Id.)  While she experienced mild difficulty getting on and off the examination table and rising from a chair, she used no assistive devices.  (Id.)  Dr. Naughten stated that plaintiff had full range of movement in her extremities and spine. (R. 223)  Strength of the left leg and upper extremities was "5/5" and strength of right leg

was "4/5."  (Id.)  There was no evident subluxations, contractures, anklyosis, or thickening, and no redness, heat, swelling or effusion.  (Id.)  Joints were stable and non-tender, with mild crepitus in the right knee.  (Id.)  An x-ray of the left knee showed no abnormalities.  (R. 223, 225)  In addition to his observations concerning  plaintiff's knees, Dr. Naughten also observed that plaintiff's hearing was poor to fair.  (R. 222)

In general, Dr. Naughten found that plaintiff dressed appropriately, maintained good eye contact, and appeared oriented in all spheres.  (R. 223)  He found no evidence of hallucinations, delusions, impaired judgment or significant memory impairment.  (Id.)  The remainder of the examination findings were unremarkable.  (R. 222-23)  Dr. Naughten diagnosed a history of hearing impairment bilaterally and right knee arthritis.  (R. 223)  He stated that plaintiff had no limitations with seeing, talking, sitting, standing, walking, pushing, pulling, or reaching.  (R. 224)  The plaintiff did have moderate limitations with lifting, carrying, handling objects, and climbing stairs.  (Id.)

On April 29, 2008, Dr. Abraham Eviatar, an ear, nose and throat specialist, examined plaintiff.  (R. 219-20)  Plaintiff stated that she had suffered with  hearing loss since birth but had not used hearing aids.  (R. 219)  A hearing test revealed mild to moderate hearing loss in the right ear and moderate to severe hearing loss in the left ear.  (R. 220)  Plaintiff had 100 percent speech discrimination in both ears.  (R. 219-20)  Dr. Eviatar opined that surgery could be done in the right ear to improve hearing, and that hearing aids in both ears would be helpful.  (R. 219)  With such treatment, the right ear would have normal hearing and the left ear should improve to thirty decibels or better.  (Id.)

III.     ADDITIONAL EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

After the ALJ's decision in October 2009, plaintiff submitted additional evidence to the Appeals Council.  (R. 4, 145-48, 296-313)  On November 3, 2009, plaintiff visited the behavioral health clinic at MHHC, complaining of sleep and appetite disturbance, crying spells, difficulty concentrating, feelings of isolation and hopelessness, rumination, migraines, and fatigue.  (R. 309)  Plaintiff reported onset of symptoms in 2001 when she started therapy at MHHC for depression and intensification of symptoms in the previous two weeks.  (Id.)  She reported having discontinued psychotropic medication one to two years earlier.  (R. 308)  She stated that she has no current suicidal ideation.  (Id.)  Plaintiff expressed desire to learn English, prepare for the citizenship examination, and take a course in computers. (R. 305)  She stated that she was unemployed and looking for work, actively involved in religious/spiritual practices, and that her activities included watching television and cooking for her children.  (Id.)

In her mental status evaluation, the social worker reported that plaintiff was cooperative, but exhibited restless behavior and appeared depressed and anxious.  (R. 303)  Plaintiff's speech was normal.  (Id.)  She was oriented to time, place, and person. (Id.)  Her memory, attention and concentration were intact.  (Id.)  Plaintiff's judgment was fair and intelligence functioning average, but her insight and impulse control were poor.  (Id.)  Her thought process was normal, and she reported no delusions, obsessions, or phobias.  (Id.)  Plaintiff did report suffering from hallucinations, but not within the last year  (Id.)  She had difficulty with social relationships, stating that she frequently argued with others and preferred to be alone.  (R. 305)  The social worker provisionally diagnosed depressive disorder, not otherwise specified.  (R. 302)  Two months later, on

January 27, 2010, a psychiatrist evaluated plaintiff, diagnosed bipolar disorder, unspecified, and prescribed medication.  (R. 312)

On September 23 2010, a physical therapist from Total Medical P.C. submitted another letter stating that plaintiff had been attending physical therapy treatment since February 12, 2009.  (R. 313)

IV.    APPLICABLE LAW

   A.  Standard of Review

Under Rule 12(c), Fed. R. Civ. P., a movant is entitled to judgment on the pleadings only if the movant establishes "that no material issue of fact remains to be resolved and that [it] is entitled to judgment as a matter of law."  Juster Assocs. v. City of Rutland, Vt., 901 F.2d 266, 269 (2d Cir. 1990) (citations omitted).  Judgment on the pleadings is appropriate where no material facts are in dispute, and "where a judgment on the merits is possible merely by considering the contents of the pleadings."  Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988) (citation omitted).

Review of the Commissioner's final decision denying disability benefits is limited.  The court may not determine de novo whether the plaintiff is disabled.  Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citing Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996)); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).  If the Commissioner's findings are free of legal error and supported by substantial evidence, the court must uphold the decision.  42 U.S.C. § 405(g) ("The findings of the Commissioner, . . . if supported by substantial evidence, shall be conclusive, and where a claim has been denied . . . the court shall review only the question of conformity with [the] regulations . . . ."); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing Bubnis v.

14

Apfel, 150 F.3d 177, 181 (2d Cir. 1998)).  Therefore, a court's review involves two

levels of inquiry.  Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  First, the court

must review whether the Commissioner applied the correct legal standards.  Tejada, 167

F.3d at 773; see Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) (citing 42 U.S.C.

§405(g) and holding that a court must first review the ALJ's decision for correct legal

principals before applying the substantial evidence standard).  Second, the court must

decide whether the Commissioner's decision is supported by substantial evidence.

Tejada, 167 F.3d at 773.

   The ALJ's "[f]ailure to apply the correct legal standards is grounds for

reversal."  Pollard v. Halter, 377 F.3d 183, 189 (2d Cir. 2004) (quoting Townley v.

Heckler, 748 F.2d 109, 112 (2d Cir. 1984)).  The ALJ's factual findings supported by

substantial evidence are "binding" on this court; however, "where an error of law has

been made that might have affected the disposition of the case," this court cannot simply

defer to the ALJ's factual findings.  Id.  Legal error may include failure to adhere to the

applicable regulations.  Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (citing

Schaal, 134 F.3d at 504-05).

   Substantial evidence means "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison

Co. of N.Y. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Halloran v. Barnhart, 362

F.3d 28, 31 (2d Cir. 2004) (per curiam).  Relevant evidence includes inferences and

conclusions drawn from evidentiary facts.  Rivas v. Barnhart, 2005 WL 183139, at *18

(S.D.N.Y. Jan. 27, 2005) (citations omitted).  "Where the Commissioner's decision rests

on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner."  Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002).  When reviewing the evidence supporting the Commissioner's position to determine whether it is substantial, the court should review the record as a whole, and "not look at that evidence in isolation[,] but rather [] view it in light of other evidence that detracts from it." Alston v. Sullivan, 904 F.2d 122, 126 (2d. Cir. 1990) (citation omitted).  However, even if there is substantial evidence contrary to the Commissioner's position, the Commissioner's determination will not be disturbed.  See DeChirico v. Callahan, 134 F.3d 1177, 1182 (2d Cir. 1998) (upholding the Commissioner's decision where there was substantial evidence for both sides).

When reviewing the factual record, it is not this court's role "to resolve evidentiary conflicts . . .[or] to appraise the credibility of witnesses, including the claimant;" instead, those are judgments for the Commissioner to make.  Carroll v. Sec'y of Health and Human Services, 705 F.2d 638, 642 (2d Cir. 1983) (citations omitted).  Accordingly, genuine conflicts in the medical evidence are for the Commissioner to resolve.  Veino, 312 F.3d at 588 (citations omitted).  Courts give great deference to an ALJ's credibility determination because the ALJ had the opportunity to observe plaintiff's demeanor while testifying.  Ruiz v. Barnhart, 2006 WL 1273832, at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. Apr. 24, 1995).

Before deciding if the Commissioner's determination is supported by substantial evidence, courts must first be satisfied that the claimant received "a full hearing under the Secretary's regulations and in accordance with the beneficent purposes

of the Act." Echevarria v. Sec'y of Health and Human Servs., 685 F.2d 751, 755 (2d Cir.

1982) (quoting Gold v. Sec'y of Health, Educ. and Welfare, 463 F.2d 38, 43 (2d Cir.

1972)). The ALJ has an affirmative duty to fully and fairly develop an administrative

record. Echevarria, 685 F.2d at 755. This duty arises from the essentially non-

adversarial nature of a benefits proceeding where the Secretary is not represented.

Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). "[W]here there are deficiencies in

the record, an ALJ is under an affirmative obligation to develop a claimant's medical

history 'even when the claimant is represented by counsel . . . .' " Rosa v. Callahan, 168

F.3d 72, 79 (2d Cir. 1999) (quoting Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). To

this end, "the reviewing court must make a 'searching investigation' of the record to

ensure that" the ALJ protected the claimant's rights. Robinson v. Sec'y of Health and

Human Servs., 733 F.2d 255, 258 (2d Cir. 1984) (citation omitted). "If the reviewing

court determines that a claimant did not receive a 'fair and adequate hearing' before the

ALJ, . . . it must remand the case to the Commissioner . . . ." Watson v. Astrue, 2009

WL 6371622, at * 5 (S.D.N.Y Feb. 4, 2009) (citing Echevarria, 685 F.2d at 755-57). "A

finding of gaps in the record or need for further development of the evidence is cause for

remand." Batista v. Chater, 972 F. Supp. 211, 217 (S.D.N.Y. 1997) (citing Parker, 626

F.2d at 235.

        Along with evidence presented to the ALJ, any additional evidence

presented to the Appeals Council becomes part of the administrative record and subject to

judicial review by the district court, regardless of whether the Appeals Council grants or

denies review. Perez, 77 F.3d at 45. Evidence submitted to the Appeals Council must

(1) be new, (2) be material, and  (3) "relate to the period on or before the ALJ's

decision." Id. (summarizing 20 C.F.R § 416.1470(b)).

   B.  Five-Step Disability Determination

           The Social Security Act defines "disability" in relevant part as the

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A).  The Act provides that "an individual shall be

determined to be under a disability only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy, regardless of whether such

work exists in the immediate area in which he lives, or whether a specific job vacancy

exists for him, or whether he would be hired if he applied for work."  42

U.S.C. § 423(d)(2)(A); Rosa, 168 F.3d at 77.  The Commissioner's determination of a

claimant's disability follows a five-step sequential analysis promulgated by the SSA.  See

20 C.F.R. § 404.1520. The Second Circuit has described this analysis as follows:

> "First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, [second,] the
> [Commissioner] considers whether the claimant has a "severe impairment"
> which significantly limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an
> impairment which is listed in Appendix 1 of the regulations. If the
> claimant has such an impairment, the [Commissioner] will consider him
> disabled without considering vocational factors such as age, education,
> and work experience . . . Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's severe
> impairment, he has the residual functional capacity to perform his past

work. Fifth, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

Rosa, 168 F.3d at 77 (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir.1982) (per curiam)); accord Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002).

The claimant bears the burden of proof for the first four steps. Shaw, 221 F.3d at 132. If the claimant meets his burden on the first four steps, then the burden shifts to the Commissioner at the fifth step to "show there is other gainful work in the national economy which the claimant could perform." Draegert, 311 F.3d at 472 (citing Carroll, 705 F.2d at 642). Work that exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A). At this fifth step, the Commissioner considers the claimant's residual functional capacity and vocational factors, such as age, education, and work experience, to see if he can make an adjustment to other work. 20 C.F.R. § 416.920. To assist in this process, an ALJ uses Medical-Vocational Guidelines ("the Grids"). See 20 C.F.R. Part 404, Subpart P, Appendix 2. But, solely relying upon the Grids is inadequate where the Medical-Vocational Guidelines do not particularly address plaintiff's limitations. See 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e); Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y., 1996).

If a plaintiff has nonexertional impairments, the Commissioner must determine if they are significant.[4] "[W]hen a claimant's nonexertional impairments significantly diminish his ability to work-over and above any incapacity caused solely

---

[4] Nonexertional impairments are those, other than strength impairments, that affect one's ability to perform work related functions and include "difficulty functioning because [one is] nervous, anxious, or depressed," "difficulty maintaining attention or concentrating," and/or "difficulty understanding or remembering detailed instructions." See 20 C.F.R. § 404.1569(a)(c).

from exertional limitations . . . the Secretary must introduce the testimony of a

vocational expert (or other similar evidence) that jobs exist in the economy which

claimant can obtain and perform."  Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986)

(emphasis added); see also Pratts, 94 F.3d at 38-39.

        The Second Circuit has established that the "application of the grid

guidelines and the necessity for expert testimony must be determined on a case-by-

case basis."  Bapp, 802 F.2d at 605.  More specifically,

> If the guidelines adequately reflect a claimant's condition,
> then their use to determine disability status is appropriate
> . . . . By the use of the phrase "significantly diminish" we
> mean the additional loss of work capacity beyond a
> negligible one or, in other words, one that so narrows a
> claimant's possible range of work as to deprive him of a
> meaningful employment opportunity.

Id. at 605-06; but see  Clark v. Heckler, 733 F.2d 65, 69 (8th Cir. 1984) ("[W]here a

claimant suffers from a nonexertional impairment the Guidelines are not applicable.").

C.  Treating Physician Rule

        The opinion of a claimant's treating physician regarding "the nature and

severity of [claimant's] impairments" will be given controlling weight if it "is well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is

not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §

416.927(d)(2); Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003).  A lack of

specific clinical findings in the treating physician's report does not, by itself, permit the

ALJ to discredit the treating physician's report. Clark v. Comm'r of Soc. Sec., 143 F.3d

115, 118 (2d Cir. 1998); Schaal, 134 F.3d at 505.  However, the treating physician's

opinion is not afforded controlling weight when the opinion is inconsistent with other

substantial evidence in the record, such as the opinions of other medical experts.  20

C.F.R. § 416.927(d)(2); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  In such a case,

a report from a consultative physician may constitute substantial evidence.  Mongeur v.

Hecklerd, 722 F.2d 1033, 1039 (2d Cir. 1983); Carrington v. Barnhart, 2005 WL

2738940, at *9 n.2 (S.D.N.Y. Oct. 19, 2005).  "[T]he less consistent [the treating

physician's] opinion is with the record as a whole, the less weight it will be given."

Snell, 177 F.3d at 133; see 20 C.F.R. § 416.927(d)(4).

     Further, a treating physician's opinion that the claimant is "disabled" or

"unable to work" is not controlling.  20 C.F.R. § 416.927(e)(1).  Additionally, medical

opinions regarding whether the claimant's "impairment(s) meets or equals the

requirements of any impairment(s) in the Listing of Impairments in appendix 1," medical

opinions regarding plaintiff's RFC, and the application of vocational factors are not

controlling.  20 C.F.R. § 416.927(e)(2).  Medical opinions on such issues are merely a

consideration and not determinative.  20 C.F.R. § 416.927(e).  Such issues are reserved to

the Commissioner.  Id.  Reserving these issues to the Commissioner relieves the SSA of

having to credit a doctor's finding regarding these issues, but that "does not exempt [the

ALJ] from [his] obligation . . . to explain why a treating physician's opinions are not

being credited."  Snell, 177 F.3d at 134.

     If the treating physician's medical opinion is not afforded controlling

weight, the following factors must be considered to determine the weight given to the

opinion: (i) the frequency of the examination and the length, nature, and extent of the

treatment relationship; (ii) the evidence in support of the treating physician's opinion;

(iii) the opinion's consistency with the record as a whole; and (iv) whether the treating

physician is a specialist.  See Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir.

1998) (citing 20 C.F.R. § 416.927(d)(2)).  Furthermore, when the ALJ gives the treating

physician's opinion less than controlling weight, he must provide good reasons for doing

so.  Id.; see also Schaal, 134 F.3d at 505 (stating that the ALJ must "set forth his reasons

for the weight he assigns to the treating physician's opinion"); Snell, 177 F.3d at 134

("The requirement of reason-giving exists . . . to let claimants understand the disposition

of their cases . . . even – and perhaps especially – when those dispositions are

unfavorable.")

    D.  <u>Subjective Claims of Pain and Symptoms</u>

        The subjective experience of pain and other symptoms can support a

finding of disability.  In assessing a plaintiff's subjective claims of pain and other

symptoms, the ALJ must first determine that there are "medical signs and laboratory

findings which show that [the claimant has] a medical impairment which could

reasonably be expected to produce the pain." Snell, 177 F.3d at 135 (quoting the rule for

evaluating symptoms for Disability Insurance, 20 C.F.R. § 404.1529(a), which has

identical language to same rule for Supplemental Security Income, C.F.R. 416.929(a)).

Second, assuming that these exist, the ALJ must then assess the claimant's complaints,

considering the following factors: (1) daily activities; (2) the location duration,

frequency, and intensity of the pain or other symptoms; (3) precipitating and aggravating

factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to

alleviate pain or other symptoms; (5) treatment, other than medication, received for relief

of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and

(7) other factors concerning functional limitations and restrictions due to pain or other

symptoms. 20 C.F.R. § 416.929(c)(3).

Third, after considering these factors, the ALJ "has the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment … regarding the true extent of the pain alleged by the claimant." Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (quoting McLaughlin v. Sec'y of Health, Educ. and Welfare of the U.S., 612 F.2d 701, 705 (2d Cir. 1980) (citation omitted)). "If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." Aponte v. Sec'y, Dep't of Health and Human Servs. of the U.S., 728 F.2d 588, 591 (2d Cir. 1984) (citation omitted). "[D]isability requires more than mere inability to work without pain." Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983). The "pain must be so severe . . . as to preclude any substantial gainful employment." Id.

## V.  DISCUSSION

This Court upholds ALJ Pecoraro's finding that plaintiff was not disabled. Contrary to plaintiff's assertion that the ALJ's decision was "erroneous, not supported by substantial evidence on the record and/ or contrary to the law" (Compl. ¶ 9), this Court concludes that the ALJ applied the correct legal standard and her decision is supported by substantial evidence.  Specifically, the ALJ's five-step disability determination, decision not to give Dr. Sheldon's opinion controlling weight and finding that plaintiff's testimony was less than credible were consistent with legal standards and supported by substantial evidence in plaintiff's medical records.

### A.  Application of the Five-Step Disability Determination

ALJ Pecoraro made her determination of plaintiff's disability by applying the five-step process for evaluating disability claims.  (R. 19-28)  see 20 C.F.R. §

416.920; <u>Rosa</u>, 168 F.3d at 77.  At step one, ALJ Pecoraro determined that plaintiff had

not engaged in substantial gainful activity since January 10, 2008, the application date.

(R. 21)  At step two, she found that plaintiff's combination of  mild degenerative joint

disease of the knees, left ear hearing loss, depressive disorder, and panic disorder without

agoraphobia, constituted a "severe combination of impairments," which is defined in 20

C.F.R. 416.920(c), as "significantly limit[ing] [plaintiff's] physical or mental ability to do

basic work activities."  (<u>Id.</u>)  At step three, the ALJ determined that this combination of

impairments did not meet or medically equal one of the listed impairments in Appendix 1

to Subpart P of Part 404, meaning that plaintiff was not per se disabled.  (<u>Id.</u>)

   At step four, the ALJ was required to determine the extent of plaintiff's

RFC and whether, with this RFC in mind, she could perform her past work.  20 C.F.R. §

416.920.  The ALJ first found that plaintiff had the RFC to perform "light work" as

defined in 20 C.F.R. 416.967(b).[5]  (R. 23)  Such a finding is supported by substantial

evidence.  Specifically, Dr. Naughton observed that although the plaintiff had a stiff gait

and mild crepitus in her knees, she had no limitations in standing, walking, sitting,

pushing, pulling, or reaching.  (R. 222-24)  Her complaints of debilitating knee pain were

contradicted by the fact that she required no assistive devices for walking.  (<u>Id.</u>)  Dr.

Naughton did assess moderate limitations for lifting carrying, handling objects and

climbing stairs.  (<u>Id.</u>)  As the ALJ notes, however, such limitations are consistent with a

conclusion that plaintiff can perform light work.  (R. 25)  The ALJ then found that

---

[5] 20 C.F.R. 416.967(b):  "Light work involves lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is
in this category when it requires a good deal of walking or standing, or when it involves sitting most of the
time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full
or wide range of light work, you must have the ability to do substantially all of these activities."

plaintiff had no past relevant work as defined in 20 C.F.R. 416.965.  This finding is based on the plaintiff's own statements and earnings' records.  (R. 27)

Since the plaintiff's claim survived the first four steps of the inquiry, the burden then shifted to the Commissioner to demonstrate whether plaintiff has the RFC to perform other jobs existing in significant numbers in the national economy. Draegert, 311 F.3d at 472 (citation omitted).  The ALJ found that the Commissioner had met that burden.  Based on the plaintiff's age, educational background, work experience, and residual capacity, and in conjunction with the Grids, the ALJ found that (1) plaintiff had "the vocational base for unskilled light work" and (2) this vocational base was not "substantially eroded" by nonexertional limitations.  (R. 27) Plaintiff, the ALJ acknowledged, does have "mild limitations in the ability to interact appropriately with others [and] moderate limitations in maintaining attention and concentration for complex tasks."  (R. 23)  The ALJ explained, however, that these impairments "do not result in disabling limitations."  (R. 24)

ALJ Pecoraro was correct in applying the Grids to determine whether plaintiff could perform in the national economy. While an ALJ's reliance on the Grids may be inappropriate when the plaintiff has nonexertional limitations, such limitations do not necessarily preclude the use of the Grids. See Pratts, 94 F.3d at 39.  Instead, relying solely on the Grids is inappropriate when nonexertional limitations "significantly diminish" plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations. Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir 2010) (quoting Bapp, 802 F.2d at 605).

ALJ Pecoraro's decision to apply the Grids was appropriate because plaintiff's nonexertional limitations did not significantly limit her ability to carry out unskilled light work.  The ALJ considered all medical and non-medical evidence on the record, including the opinion of plaintiff's treating physician: Dr. Sheldon. As will be discussed below, the ALJ did not give controlling weight to Dr. Sheldon's opinion.  See Discussion infra Part IV.C.  Instead, ALJ Pecoraro gave the greatest weight to the opinions of the consulting physicians: Drs. Broska, Naughton and Eviatar and the State agency review psychologist.  From this evidence, she noted that even considering plaintiff's nonexertional limitations, plaintiff could still meet "the basic mental demands of competitive, remunerative, unskilled work includ[ing:] to understand, carry out and remember simple instructions; to respond appropriately to supervision, co-workers, and usual work situations; and, to deal with changes in a routine work setting."  (R. 27) The ALJ's conclusion that these abilities allow plaintiff to perform unskilled light work — defined in 20 CFR § 416.968(a) as encompassing "simple duties" which require "little or no judgment" and "can be learned on the job in a short period of time" — is therefore supported by substantial evidence. (R. 27)  Because the ALJ properly found that plaintiff's nonexertional impairments did not significantly diminish her ability to do work, the ALJ was not required to receive testimony from a vocational expert.

B.  Application of the Treating Physician Rule

ALJ Pecoraro's decision not to give controlling weight to plaintiff's treating physician was correct and is supported by substantial evidence.  In determining the "nature and severity of [claimant's] impairments," an ALJ may refrain from giving controlling weight to the treating physician's opinion.  In coming to such a conclusion,

26

the ALJ must first determine that the treating physician's opinion is inconsistent with other substantial evidence in the record, including the opinions of other medical experts. 20 C.F.R. § 416.927(d)(2); Snell, 177 F.3d 128 at 133. The Second Circuit has noted that "[i]t is an accepted principle that the opinion of a treating physician is not binding if it is contradicted by substantial evidence… and the report of a consultative physician may constitute such evidence." Mongeur, 722 F.2d at 1039.  Once she has decided that a treating physician's opinion will not be given controlling weight, an ALJ "will always give good reasons… for the weight [she] give[s] [claimant's] treating source's opinion." 20 C.F.R. § 416.927(d)(2); See Halloran, 362 F.3d at 32 (per curiam)).

ALJ Pecoraro determined that the opinion of Dr. Sheldon, plaintiff's treating physician, was inconsistent with other substantial, more recent, evidence in the record.  The ALJ first noted that the treating physician's opinion was "of little relevance in determining whether the [plaintiff was] disabled…." at the time of application in part because it was "dated well prior to the time under consideration."  (R. 24)  The ALJ was correct in giving the opinion less weight because of its remoteness to the time period in question. The opinion is based upon observations two years prior to the date of plaintiff's application for benefits.  The ALJ also noted that Dr. Sheldon's opinion was inconsistent with more recent evidence showing that plaintiff's limitations were not disabling.  (R. 24) This substantial evidence included the opinions of three consultative physicians, Drs. Broska, Naughton and Eviatar, and one State agency review psychologist, Dr. T. Harding.  (R. 25)  Unlike the treating physician's opinion, these later opinions were "well-supported and not inconsistent with substantial evidence from the relevant period." (R. 25-26)  The ALJ may properly decide to give less weight to a treating physician's

27

opinion which is inconsistent with the record as a whole and instead give more weight to consultative physicians' opinions which are consistent with the record as a whole.  See 20 C.F.R. § 416.927(d)(2); Mongeur, 722 F.2d at 1039.

Not only must the ALJ determine that the treating physician's opinion will be given less weight, she must explain her decision, using the factors provided by the SSA in 20 C.F.R § 416.927(d)(2)(i)-(ii), (3)-(6). Although ALJ Pecoraro did not mention the factors by name, the ALJ explained her decision in terms that fall neatly within two of them:  the "frequency of the examination" and the consistency of the opinions with the record as a whole.  20 C.F.R. 416.927(d)(2)(i), (d)(4).  ALJ Pecoraro notes that the "remote opinion" is of "little value in determining what the [plaintiff] can still do…." (R.25)  Such a remoteness in time undercuts one of the reasons why treating physicians' opinions are ordinarily favored, namely that they provide a "longitudinal picture of [plaintiff's] impairment."  20 C.F.R. 416.927(d)(2)(i).  The ALJ also properly explained that the opinion would be given less weight because of its inconsistency with the record as a whole, particularly with the opinions of the consultative physicians. Using the rationale described above, the ALJ explained that "great weight" would be given to the opinions of Drs. Broska, Naughton and Eviatar's  and even "more weight" would be given to the opinion of the State agency review psychologist, Dr. Harding, because they are well-supported and not inconsistent with the record.  (R. 25-26)  The inconsistency of the  treating physician's opinion with the record, along with the temporal distance between the treating physician's opinion and the application date, provide good reason for the ALJ's decision that the treating physician's opinion should not be given controlling weight.

C.  Consideration of Plaintiff's Subjective Claims of Pain and Symptoms

      ALJ Pecoraro properly found that plaintiff's statements about her pain and symptoms were not credible. An ALJ may properly make such a credibility decision if her decision, after reviewing the medical findings and other evidence in the record, is supported by substantial evidence. Aponte, 728 F.2d 588 at 591.  If the decision is supported by such evidence, the district court must uphold the decision for "genuine conflicts in the medical evidence are for the Secretary to resolve." Id.

      ALJ Pecoraro's finding that plaintiff's statements were not credible is supported by substantial evidence.  As the ALJ notes in her decision, the plaintiff's claims that her depression kept her from leaving the apartment, thereby causing her to miss her mental health treatments, is challenged by her testimony that she accompanied her daughter to her counseling appointments every Friday, walked her son to school, and attended church services several times a week.  (R. 26)  Her claim of disability based on hearing loss is similarly undermined by her acknowledgement that she has no difficulty hearing conversations.  (Id.)  As for her knee pain, the ALJ noted that plaintiff is not so disabled as to be unable to take public transportation. (Id.)  Overall, the ALJ also noted that plaintiff describes a range of activities that are inconsistent with a claim of disability: receiving guests from church, cooking and cleaning for her children, getting her children ready for school, assisting them with homework, and handling household bills. (Id.)  The ALJ also pointed out that in her consultative visit with Dr. Broska, plaintiff claimed that she could not manage money or take public transportation.  (Id.)  However, under oath during the hearing, plaintiff admitted that she could do both.  (Id.)   Based on this substantial evidence, the ALJ's determination that "[t]he contradictions between the

[plaintiff's] allegation of disability and her actual functioning negatively impact her credibility" was correct.  (Id.)

    D.  <u>Consideration of Additional Evidence Submitted to the Appeals Council</u>

           Plaintiff submitted additional evidence to the Appeals Council after the ALJ issued her decision. (R. 4, 145-48, 296-313)  The Appeals Council considered this evidence.  (R. 1-2, 4-5)  As the Appeals Council properly found there was no reason to reverse the ALJ's decision.  (R. 1)

           SSA regulations state that evidence submitted to the Appeals Council must be new and material. 20 C.F.R. 416.1470.  Additionally, "the Appeals Council shall consider . . . additional evidence only where it relates to the period on or before the administrative law judge hearing decision."  (Id.)  In making her request for review to the Appeals Council, plaintiff included a letter from a physical therapist, dated February 23, 2010, stating that she had attended physical therapy since February 12, 2009.  (R. 313)  However, this letter repeats, almost verbatim, the same information provided in an earlier letter from the same therapist, dated September 15, 2009.  (R. 265)  Plaintiff also submitted a list of prescribed medications from March 13, 2009 through March 30, 2010.  (R. 146-148)  This list of medications does not present any material evidence as to the plaintiff's ability to work.  Finally, plaintiff included additional medical records for the period from November 3, 2009 through February 19, 2010, during which she was seen by the behavioral health clinic at MHHC.  (R. 296-312)  These records included an "Initial Psychiatric Evaluation" which took place on January 27, 2010, in which she was diagnosed with "Bipolar Disorder, Unspecified."  (R. 310-312)  This evidence fails the third requirement in 20 C.F.R. 416.1470 because the medical records relate to a period

which was not "on or before the administrative law judge hearing decision" which was issued on October 23, 2009.  (R. 13)  Each additional piece of evidence provided by plaintiff failed one of the requirements of the statute and therefore did not provide a reason to disturb the ALJ's decision.

## VI.  CONCLUSION

In summary (1) the ALJ properly applied the five-step disability determination analysis and the treating physician rule; and (2) the ALJ's decision was supported by substantial evidence in the record. Therefore, defendant's motion for judgment on the pleadings is granted, and the Commissioner's decision is affirmed. The Clerk should enter judgment for the defendant.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       July 20, 2011